**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **COLONY INSURANCE COMPANY,** ) | |
| as subrogee for Regeneration, LLC and ) | |
| Roy Granger, ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| *vs*. ) | **3:14-cv-01051-WHA** |
| ) | |
| **AL & SONS CORP. and** ) | |
| **AL MITCHELL,** ) | |
| ) | |
|     **Defendants.** ) | |

**BRIEF OF COLONY INSURANCE COMPANY, AS SUBROGEE
FOR REGENERATION, LLC AND ROY GRANGER,
IN OPPOSITION TO DEFENDANTS' MOTION
<u>FOR SUMMARY JUDGMENT</u>**

Comes Now Colony Insurance Company, as subrogee for Regeneration, LLC and Roy Granger (hereinafter "Colony"), by and through counsel, and hereby file this its Brief in Opposition to the Motion for Summary Judgment [Doc. 11] filed by Defendants Al & Sons Corp. and Al Mitchell (hereinafter "Mitchell").

    **I.**    **Summary Judgment Standard**

Under Fed. R. Civ. P. 56, summary judgment should be entered if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Accordingly, the party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion

and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions on file, or any affidavits "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Co. v. Catrett*, 477 U.S. 317, 322-23 (1986). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *Edwards v. Kia Motors of America, Inc.*, 486 F.3d 1229, 1233 (11th Cir. 2007); *Cast Steel Prods., Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1301 (11th Cir. 2003).

**II.     Statement of Undisputed, Relevant, Material Facts**

1. Roy Granger is the owner of Regeneration, LLC. See, deposition transcript of Roy Granger p. 6 attached hereto as Exhibit A.

2. Roy Granger worked with Saucier Investments, LLC to purchase the Pepperell Mill property in 2011. See, contract to purchase Pepperell Mill attached hereto as Exhibit B.

3. Al Mitchell owns Al & Sons Corp. See, deposition transcript of Al Mitchell p. 9 attached hereto as Exhibit C.

4. Al & Sons began working at the Pepperell Mill property in December 2011. Id. at p. 20; Exhibit A p. 33.

5. Al Mitchell and Regeneration entered into an agreement in December 2011. See, Exhibit A at p. 127; contract between Al Mitchell and Regeneration attached hereto as Exhibit D. This contract is general in nature for metal salvage at the Pepperell Mill location and not for the Gray building. See, Exhibit A at p. 128.

6. Roy Granger did not call Mitchell to come and do the work at Pepperell Mill. Mitchell just showed up one day. Regeneration did not hire Mitchell to do work, they sold Mitchell material and Mitchell used his men and equipment to remove what Mitchell has purchased. See, Exhibit A pp. 55-56.

7. Roy Granger explained how Mitchell came to do work on the third floor of the Gray Building. Mitchell and he went to the third floor for Mitchell to give a price to remove the scrap that Mitchell wanted. The price was agreed on, Saucier accepted and they (Mitchell) started removing them. Id. at pp. 58-59.

8. Ultimately, Mitchell bought the chiller units, the pipe that was inside the chiller room. Exhibit A at p. 33.

9. Mitchell has admitted that he purchased the metal that his men were removing from the third floor of the Opelika Mill from Saucier Investments. See, Mitchell's responses to Colony's Request for Admissions attached hereto as Exhibit E.


10. After purchasing material that he would salvage from Saucier Investments, his employees that worked for him would come in, he would show them what to take down and what to not take down. See, Exhibit C at pp. 22-23, 121-122. Regeneration never paid Mitchell for the work they did. Id. at p. 23.

11. Mitchell would make an offer to buy everything inside the chiller room. Saucier Investments would be presented the offer to buy the metal and would then agree on that sale. Mitchell would bring in his own labor and sell what he removed from the buildings. Whatever he made over what he paid Saucier was his profit. See, Exhibit A at pp. 34-35.

12. The men that worked for Mitchell had worked for him for years. When he bought material to salvage he would call them and tell them where to go. They would hire some laborers locally. They were paid by Mitchell and not Regeneration. See, Exhibit C at pp. 29-32. One of the men that worked for Mitchell was Tommy Schwalm. Id. at pp. 29-30.

13. Mitchell trained his men to always be safe especially with fires. He told his men to watch for fires and do a fire watch at the end of the day. Id. at pp. 41-44. Mitchell held these meetings with his men probably every two days. He stressed to his men constantly about fire safety. See, Exhibit C at pp. 43-44, 117. Mitchell conducted these training sessions ever couple of days himself. He trained them to

remove the metal, set up scaffolding. Regeneration did not do any training for Mitchell. Exhibit C at pp. 117-118.

14. Mitchell also admits that Regeneration did not pay them for the work they did or do any tax paperwork for them. Id. at p. 118.

15. Regeneration was not directing Mitchell on what they needed to do everyday. Mitchell paid his employees and used his own equipment. See, Exhibit C at pp. 118-119. Regeneration did not give Mitchell assignments at the Gray Mill building. Id. At p. 120.

16. Mitchell admits that no employee of Regeneration was assisting in the removal of the metal where the fire occurred. See, Exhibit E.

17. Mitchell was not an employee of Regeneration and Mitchell was responsible for the training of his employees. Id.

18. The fire that created the dispute that was filed in the Circuit Court of Lee County, Alabama styled *Saucier Investments, LLC v. Al & Sons, Corp, Al Mitchell, Regeneration, LLC* Civil Action No. CV-14-900138, occurred in March 2013. This fire was in the Gray Mill building. See, Exhibit A pp. 39, 45-46.

19. Before Mitchell began working with his men in the Gray Mill building on the third floor, Mitchell had his men de-construct the screen printing building

across the street from the Gray Mill building, and also removed equipment in the boiler room and chiller room.  Exhibit A p. 43.

20.     Mitchell's men were working on the third floor of the Gray Mill building for about two weeks before the fire began.  Id. at pp. 43-47.

21.     During those two weeks Roy Granger and Regeneration were not made aware of spot fires or lint fires that Mitchell's crew were having.  Id.

22.     One of the men that was working on the third floor for Mitchell was Tommy Schwalm.  Tommy Schwalm was not working for Regeneration at the time of this fire.  See, deposition transcript of Tommy Schwalm p. 121 attached hereto as Exhibit F.  Schwalm was an employee of Mitchell; See, Exhibit E.

23.     Tommy Schwalm admitted that he received no training from Regeneration and that his boss, Mitchell, told them they could not have any fires. See, Exhibit F at p. 123.  He got no instructions from Granger or Walter Sims.  Id. at p. 59.

24.     Tommy Schwalm testified that on the day of the fire, March 12, 2013, he was working on the third floor.  He was using a demolition saw on the third floor the day of the fire. See, Exhibit F at pp. 56-57; Exhibit E.  Mr. Schwalm testified that it was more profitable for Mitchell to cut down the metal as fast as possible.  See, Exhibit F at p. 55. That is why he cut it down rather than unbolting it.  Id.

25. Roy Granger told Al Mitchell that cutting torches was strictly prohibited. See, Exhibit A p. 47.  Roy Granger told Al Mitchell numerous times that they cannot have a fire. Id.

26. Roy Granger was working on an excavator when Mitchell's men were working on the third floor of the Gray Mill building. He could not hear what they were doing as the excavator is loud. Id. at pp. 49, 138.

27. Mitchell admits that Granger told him to be careful and to make sure there is no fire. See Exhibit C at p. 50. Granger also told Mitchell not to use cutting torches on the third floor either. Id at p. 51.

28. Mitchell knew his crew was smoking on the third floor even after he told them not to. Id. at p. 52. Mitchell also knew his crew was using a cutting torch on the third floor even though they were told not to use it. Exhibit C at pp. 57-58.

29. When asked why he allowed his men to use a cutting torch when he was told not to Mitchell explained it was kind of a mistake and I shouldn't have. Id. at p. 60.

30. Mitchell also knew that the use of a cutting saw was dangerous. See, Exhibit C at p. 66.

31. Mitchell also acknowledged that his men leaving big piles of debris inside was dangerous. His men leaving the debris indoors would have been contrary to his directions. See, Exhibit C at p. 76.

32. Roy Granger told Mitchell to not use a demolition saw and not to use a torch. See, Exhibit A at p. 60.

33. At no time did anyone from Regeneration ever use a demolition saw or a torch for removing items from the Gray building. See, Exhibit A pp. 132, 137, 174.

34. Roy Granger never saw Mitchell's men using demolition saws. Granger believes the Mitchell men made the decision on their own to use the demolition saw. See, Exhibit A p. 133. Granger told Mitchell that they should not use them. Id. at p. 135.

35. Walter Sims was an employee of Regeneration, LLC when this fire occurred. See, deposition transcript of Walter Sims p. 12 attached hereto as Exhibit G. Mr. Sims had worked at the West Point Pepperell mill before it closed. Id.

36. The day of the fire, Walter Sims was at the Pepperell Mill site. Exhibit G at p. 28.

37. Walter Sims was working across the ponds and could not hear what was going on inside the Gray Mill building. Id. at p. 82.

38.     Walter Sims testified that it would be dangerous to use a cutting saw because of all the dust and lint. Id. at pp. 35-36.

39.     Walter Sims did tell Mitchell that they needed to be careful and not catch anything on fire but since he did not work with that crew he was not in charge of them. Exhibit G at p. 45.

40.     Walter Sims did a walk through of the building but was done to make sure he was the last one to leave and no one was left in there. See, Exhibit G at p. 79.

41.     When the fire occurred in March 2013, no Regeneration employees were working anywhere in the Gray Mill building. See, Exhibit A p. 146.

**III.     Legal Analysis**

**A.     Mitchell agreement to carry the appropriate amount of insurance to cover the loss suffered as a result of Mitchell's employees conduct**

Colony concedes that the language of the agreement between Mitchell and Regeneration, LLC regarding insurance coverage is not clear on the requirement of $2,000,000.00 per occurrence. See, Exhibit D. Ambiguities of a contract will be viewed against the drafter. See, *Colonial Baking Co. v. Pine Dale, Inc.*, 436 So. 2d 856, 858 (Ala. 1983) Colony recognizes that the owner of Regeneration, LLC drafted the agreement. In light of this testimony and body of case law, Colony will not pursue this argument in support of its claims against Mitchell.

9

### B. Colony is entitled to common law indemnity from Mitchell as Mitchell was in control of the actions that most likely caused the fire

Colony recognizes the general rule in Alabama is that, in the absence of a statutory or contractual basis otherwise, there is no contribution or indemnity among joint tortfeasors. *Ex parte Stenum Hosp.*, 81 So. 3d 314, 318 (Ala. 2011); *Parker v. Mauldin*, 353 So. 2d 1375 (Ala. 1977). Colony's insured, Regeneration, LLC is entitled to common law indemnity if Mitchell acted independently of Regeneration and there is no agency relationship between the two. See generally, *Criglar v. Salac*, 438 So. 2d 1375 (Ala. 1983); *Parker v. Mauldin*, 353 So. 2d 1375 (Ala. 1977). For Mitchell to be an agent of Regeneration, Regeneration must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished. See, *Campbell v. Employers Ins. Co.*, 521 So. 2d 924 (Ala. 1988) citing *Solmica of Gulf Coast, Inc. v. Braggs*, 232 So. 2d 638. (Ala. 1970). The relationship is determined by the evidence as a whole and not necessarily by how the parties characterize their relationship. See, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 133 (Ala. 1983). Thus, just because Regeneration and Mitchell are sued as joint tort feasors in the underlying state court action, does not make them joint tortfeasors.

It is undisputed that Mitchell was working independently of Regeneration. Mitchell controlled the personnel who worked on this project, how they would do their jobs, the hours they would work and their conduct while they were working on the third floor of the Gray Mill building. See, Exhibits A; Exhibit C. Mitchell also admitted and does not dispute that he instructed his employees to use demolition saws on the third floor of the Gray Mill building. Mitchell did this even though he knew of the dangers of those saws, that they could cause lint fires and in fact had caused lint fires. A fact he did not tell Regeneration. Mitchell instructed his men to use the demolition saw when they were told that they should not be used. See, Exhibit C. Mitchell's employee, Tommy Schwalm, admits that he was using a demolition saw on the third floor of the Gray Mill building the day the fire occurred. See, Exhibit F. Schwalm admits that they used the demolition saw because it was faster and increased profits. Id. It is undisputed that no one from Regeneration knew or condoned the use of the demolition saw by Mitchell on the third floor. See, Exhibit C.

Regeneration did not pay or give any money to Mitchell for work being done in the Gray Mill building. See, Exhibit A; Exhibit C. Mitchell made an offer to buy certain metals in the Gray Mill building from Saucier Investments, who owned the building. See, Exhibit C. Saucier Investments sold those metals to Mitchell and he

brought his own employees, who he trained and directed to remove the metal out of the building. Regeneration did not train Mitchell's employees nor did they control how the metal would be removed other than advising Mitchell that they could not have fires. Mitchell, who is very experienced in the metal salvage business, admitted that he was fully aware that his decision to use demolition saws could cause sparks and lead to fires. See, Exhibit C. He made the decision to use demolition saws and run the risk of causing a lint fire all in an effort to make more money. See, Exhibit C and F. There is simply no evidence that Regeneration knew that demolition saws were being used on the third floor of the Gray Mill building. Roy Granger, who owns Regeneration, LLC and was on site almost every day testified that he was on a excavator and could not hear what was being used on the third floor. See, Exhibit A. Also, Walter Sims who was an employee of Regeneration, LLC and on site regularly was working on another part of this sprawling complex and could not hear demolition saws being used by Mitchell. See, Exhibit A, Exhibit G.

    Although it is clear that Colony is entitled to common law indemnity from Mitchell to recover the amount of its contribution to the settlement of the underlying litigation based on the evidence and case law cited above, Colony would point out an exception to rule that joint tortfeasors are not entitled to indemnification or

contribution from the others.  That exception is the theory of *passive* v. *active* negligence. See, *Mallory S.S. Co. v. Druhan*, 84 So. 874 (Ala. 1920).

The Alabama Supreme Court has indicated that the term "passive negligence" may be equivalent to "vicarious liability." Active negligence refers to a form of liability based on one's own wrongful conduct. See, *Nationwide Mutual Ins. Co. v. Hall*, 643 So. 2d 551 (Ala. 1994).   It is clear from the evidence that Regeneration cannot be held vicariously liable for the actions of Mitchell.  There is no agency relationship between Mitchell and Regeneration. See, Exhibit A, Exhibit C, Exhibit D.  Mitchell acted independently of Regeneration and Regeneration had no control over Mitchell.

Regeneration maintained no control over Mitchell which establishes as a matter of law that Mitchell cannot show that any actions of Regeneration caused the fire that destroyed the Pepperell Mill property. In fact, Mitchell admits that his actions were contrary Regenerations' statements to not use demolitions saws.  See, Exhibit C.

Mitchells' admission of allowing his employees to use demolitions saws, piling debris up in the floor, using torches and not telling Regeneration about the lint fires they were experiencing in the third floor amounts to the wrongful conduct that most likely caused this fire. See, *Nationwide Mutual Ins. Co. v. Hall*, 643 So. 2d 551 (Ala. 1994).  The only comments made to Mitchell from Regeneration were reminders of

the dangers of having fires, the use of torches and demolition saws.  See, Exhibit A; Exhibit C. All of these comments were ignored by Mitchell.  See, Exhibit C.

Regeneration was involved in this project but Mitchell was completely in charge of the removal of the metals he had bought from Saucier Investments out of the Gray Mill building.  Regeneration was not involved at all with the removal of those metals, hiring of employees to remove those metals, the method of removal nor the training of those individuals to remove the metal out of the building.

Stating the above differently, the exception to the rule that indemnity will not be allowed among joint wrongdoers are that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the efficient cause of the injury. See, *Unicore, Inc. v. Tennessee Valley Auth.*, 768 F.2d 112 (6th Cir. 1985); *Coates v. CTB, Inc*., 173 F. Supp 2d 1200 (M.D. Ala. 2001); *Walter L. Couse & Co. v. Hardy Corp.*, 274 So. 2d 316 (Ala.Civ.App. 1972);

The agreement between Mitchell and Regeneration clearly revolved around how the pricing of metals would occur and was not a contract for Mitchell to do work for Regeneration. See, Exhibit A; Exhibit C; Exhibit D. There is no evidence of any daily oversight by Regeneration of Mitchell or any control of Mitchell by

Regeneration. Mitchell clearly was an independent contractor and its negligence alone caused or contributed to the fire that destroyed the Gray Mill Building. Regeneration has consistently denied, and continues to deny, that it acted wrongly in any way that resulted in the claims filed by Saucier Investments in the underlying litigation. Mitchell certainly acted in manner inconsistent with the safety measures of it admits that it should have followed. Consequently, Regeneration should not be held accountable for the clear wrongful acts of Mitchell when Regeneration had no active or passive negligence that contributed to the fire.

Thus, Colony is entitled to pursue common law indemnity against Mitchell as it is clear through Mitchell's own admission and conduct it was his decision to use demolitions saws and other equipment on the third floor of the Gray Mill building that most likely led to the fire that destroyed that building.

## IV.   Conclusion

WHEREFORE, PREMISES CONSIDERED, Colony Insurance Company would request that this Court deny the Defendants' Motion for Summary Judgment on the basis that there are clear genuine issues of material fact in dispute and the Defendants are not entitled to a judgment as a matter of law.

Submitted this 11th day of May, 2015.

   /s/ M. Andrew Donaldson
**M. ANDREW DONALDSON (ASB-9007-O76M)**
**ATTORNEY FOR PLAINTIFF**
**COLONY INSURANCE COMPANY**

**OF COUNSEL:**
**RYALS, DONALDSON &**
**AGRICOLA, P.C.**
60 Commerce Street, Suite 1400
Montgomery, AL 36104
Telephone: 334-834-5290
Facsimile: 334-834-5297
Email: adonaldson@rdafirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify I have served a copy of the foregoing instrument via electronic filing or by placing a copy of the same in the United States Mail, postage prepaid, to the following on this the 11th day of May, 2015:

S. Anthony Higgins, Esq.
Holtsford, Gilliland Higgins,
Hitson & Howard, P.C.
P.O. Box 4128
Montgomery, AL 36103

**/s/ M. Andrew Donaldson**
**OF COUNSEL**

M:\General Litigation\Colony Group\Regeneration, LLC\Federal Court\Pleadings\SummaryJudgment\Brief IOT Mtn for Summary Judgment.wpd